UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | | |
|---|---|---|---|
| MICHAEL WILHELM, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | No. 1:09-cv-94 | |
| v. | ) | | |
| | ) | *Collier / Lee* | |
| MICHAEL J. ASTRUE, | ) | | |
| Commissioner of Social Security, | ) | | |
| | ) | | |
| Defendant. | ) | | |

## REPORT AND RECOMMENDATION

This action was brought by Plaintiff, Michael Wilhelm, pursuant to 42 U.S.C. §§ 405(g),

seeking judicial review of the final decision of the Commissioner of Social Security

("Commissioner" or "Defendant") denying Plaintiff disability insurance benefits ("DIB") benefits.

Plaintiff and Defendant have filed cross motions for summary judgment [Doc. 15, 21].  For the

reasons stated below, I **RECOMMEND**: (1) Plaintiff's motion for summary judgment [Doc. 15]

be **GRANTED**; (2) Defendant's motion for summary judgment [Doc. 21] be **DENIED**; (3) the

decision of Commissioner be **REVERSED**; and (4) this action be **REMANDED**.

## I.       PROCEDURAL BACKGROUND

This is the second time Plaintiff has petitioned this Court for review of the Commissioner's

denial of disability benefits.  Plaintiff filed an application for DIB on August 3, 2005, alleging

disability since July 27, 2005, due to back, hip, and leg problems (Tr. 39, 46).  After a hearing, an

Administrative Law Judge ("ALJ") determined Plaintiff was able to perform the full range of

sedentary work and applied the Medical-Vocational Rules ("Grids") to find Plaintiff was not disabled (Tr. 18-19). Plaintiff appealed that decision to this Court, and the decision was reversed and remanded because the ALJ erred by relying on the Grids. *Wilhelm v. Comm'r of Soc. Sec.*, No. 1:07-cv-178. As held in the first remand by this Court, Plaintiff used bilateral forearm crutches, but there was an absence of evidence as to whether and to what extent Plaintiff's ability to perform the full range of sedentary work had been eroded by that limitation making reliance on the Grids improper. *Id.*

On remand, the same ALJ conducted another hearing and took the testimony of a medical expert ("ME") and a vocational expert ("VE") (Tr. 465). The ALJ also considered new medical records from the Veterans' Administration ("VA") Medical Center (Tr. 311). The ALJ found Plaintiff was "not 'medically required' to use crutches for ambulation" and his use of crutches therefore did not significantly erode his ability to perform the full range of sedentary work (Tr. 318). The ALJ again applied the Grids to find that Plaintiff could perform other work (*id.*), and Plaintiff has again appealed the ALJ's decision to this Court. The sole issue presented by Plaintiff in this appeal is whether substantial evidence supports the ALJ's finding that Plaintiff's use of crutches did not significantly erode his ability to perform the full range of sedentary work [Doc. 16 at 1].

## II.    ELIGIBILITY FOR DIB

The Social Security Administration ("SSA") determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v). If at any step in this process the claimant is determined to be disabled or not disabled, the process ends. *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden of proof with respect to the extent of her impairments, but the burden shifts to the Commissioner at step five to show that, given those impairments, there are other jobs the claimant can perform. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

## III. FACTUAL BACKGROUND AND ALJ'S FINDINGS

### A. Plaintiff's Complaints and Treatment History

Plaintiff, who is obese at over 300 pounds, was 39 years old at the time of the second administrative hearing (Tr.155, 295, 473). He had completed some college (Tr. 51, 266), and had past work experience as a cashier and laborer (Tr. 47, 79). Plaintiff alleges he is no longer able to work because of injuries to his lower right leg, left hip, and back (Tr. 46, 64). According to Plaintiff, these injuries cause him constant pain and require him to take frequent breaks (Tr. 68, 90). Plaintiff has been prescribed with forearm crutches, and he stated in the SSA application process that he "pretty much commonly use[s] them" (Tr. 63).

Plaintiff first sought treatment for his right leg injury in October, 1999, from J. Patterson Stone, M.D. (Tr. 129). Plaintiff told Dr. Stone he was injured in August, 1999, when he stepped off

a runner and caught his foot on the posterior aspect of his heel (*id.*). Plaintiff had an acorn-sized "nodule" of scar tissue indicating a possible partial tear. Dr. Stone diagnosed right achilles tendinitis and temporarily restricted Plaintiff to seated work (*id.*). Although the injury seemed to be resolving, (Tr. 126-28), Plaintiff reported that he developed pain and swelling after returning to regular duty work in January, 2000 (Tr. 125). In March, 2000, after two MRI scans, Plaintiff was diagnosed with mild reflex sympathetic dystrophy ("RSD"), and Dr. Stone scheduled a series of three nerve blocking procedures (Tr. 116-20, 133-34). After those procedures were performed, Plaintiff was still walking with a limp, had tenderness in his ankle, and his lower leg was discolored and cool to the touch (Tr. 116). On November 13, 2000, Dr. Stone noted that Plaintiff had undergone physical therapy and was walking without a cane but with an "ankle stirrup," and he walked with significantly less weight on his right leg (Tr. 112). Dr. Stone noted that Plaintiff had received a functional capacity evaluation showing he could lift 35 pounds occasionally, 20 pounds frequently, had various positional restrictions, and could stand for only 32 minutes at a time (*id.*).

Dr. Stone again saw Plaintiff on April 17, 2003, when Plaintiff returned to request a handicap permit (Tr. 110). Plaintiff complained of aching, bruising, swelling, and coolness in the leg (*id.*). On physical examination, Plaintiff's leg was cool and had a purplish discoloration with "several ulcer like small areas." (*Id.*). Dr. Stone believed a handicap permit was "appropriate," and he commented that Plaintiff's physical findings showed no significant changes from his previous examinations (*id.*).

In July, 2004, Rickey L. Hutcheson, D.O. saw Plaintiff in connection with a claim for workers' compensation (Tr. 261-62). Plaintiff stated he had felt a "pop" in his back (Tr. 261). Dr. Hutcheson observed that Plaintiff walked with a "very antalgic gait" and "really favor[ed] that right

lower extremity" (*id.*). Plaintiff had tenderness throughout his lumbar spine and over his left greater trochanteric bursa (*id.*). Dr. Hutcheson performed an injection of Kenalog and Lidocaine in the left hip and recommended therapy and Naprosyn (Tr. 262). Dr. Hutcheson opined, "I think that he is going to develop chronic greater trochanteric bursitis and I have a feeling that it is going to be something that he is just going to have to live with." (Tr. 260). Dr. Hutcheson also opined that Plaintiff's hip and back pain were caused by his abnormal gait (Tr. 259).

In October, 2004, Plaintiff complained to Dr. Hutcheson of another incident at work where he felt a "pop" in his back (Tr. 258). Dr. Hutcheson's assessment of the cause was essentially unchanged. He stated, "[Plaintiff's] gait is what is killing us. He has a very abnormal gait secondary to his RSD . . . ." (Tr. 257). Although Dr. Hutcheson opined Plaintiff could continue to perform his normal duties at work (*id.*), Plaintiff's work duties at that time were apparently not very strenuous: allegedly in order to reduce its workers' compensation liability, Plaintiff's employer had created a position with minimal work duties so that Plaintiff could stay "off [his] feet"(Tr. 270-73, 282).

Also in October, 2004, Plaintiff saw Elmer Pinzon, M.D., for complaints of pain in his lower back and left hip related to the "pop" he had felt in his lower back (Tr. 139). Dr. Pinzon noted that Plaintiff had seen a chiropractor and physical therapist for the complaints, and he observed an "audible pop" in Plaintiff's hip when he stood up (*id.*). An examination of Plaintiff's left hip showed a positive hip grind test as well as tenderness over the left greater trochanteric bursa (Tr. 141). Plaintiff was able to ambulate with an antalgic gait, but favored his left hip and had a decreased range of motion (*id.*). At a follow up appointment the next month, after an MRI was performed, Dr. Pinzon diagnosed mild disc degeneration and spondlytic changes in the lumbar spine

and early mild left hip degenerative disc disease with mild antalgic gait (Tr. 135-38). Dr. Pinzon referred Plaintiff to physical therapy (Tr. 135), but Plaintiff made no progress in his first three visits and was discharged when the therapist was unable to contact Plaintiff to schedule further appointments (Tr. 143-48).

In May, 2005, Plaintiff visited a VA facility. Plaintiff told a nurse that he had no specific complaints, but did not have a primary care physician at that time (Tr. 163). The nurse reported that Plaintiff was "[a]mbulatory without aid/support" and "can walk quite good" but had a "slight limp." (Tr. 165-66). The nurse advised Plaintiff about his obesity and recommended "exercise such as aerobics and walking" (Tr. 166).

In August, 2005, Plaintiff was treated by VA physician Charles Louis Huddleston II, M.D., for pain related to his RSD (Tr. 155-57). Dr. Huddleston noted that Plaintiff was morbidly obese (Tr. 155). Plaintiff's right leg was discolored and cool to the touch and showed chronic venous stasis changes with skin breakdown, but without infection (Tr. 156). Dr. Huddleston observed that Plaintiff had been using an air cast for several years (*id.*). Even with the air cast, however, Plaintiff experienced pain in his whole right lower extremity, ankle inversion, and buckling of the knee (*id.*). Although Plaintiff could transfer independently and walk without assistance, he walked with severe external rotation of the right leg and moderate to severe limp (*id.*). His gait disturbance had caused some atrophy in his right calf (*id.*), and X-rays showed demineralization of the foot and ankle (Tr. 157). Dr. Huddleston prescribed bilateral forearm crutches "to improve [Plaintiff's] gait mechanics and reduce the likelihood of falls." (*id.*). Plaintiff was fitted with the crutches and received gait training (Tr. 155).

In October, 2005, Plaintiff attended an appointment with VA kinesiotherapist Charles

Overall, who noted that Plaintiff "presented to the clinic ambulating with his forearm crutches and an old worn-out ankle brace held in place by rubber bands." (Tr. 439). The clinic team recommended a new brace with special shoes, but Plaintiff's ankle was too swollen for the brace to be fitted (Tr. 439-40).

In December, 2005, Weldon Wallace, M.D., saw Plaintiff for complaints of swelling and tightness in his lower right leg (Tr. 435). Dr. Wallace noted that Plaintiff "[a]mbulate[d] independently, but w[ith] a significant limp." (Tr. 436).

In April, 2006, Plaintiff attended an appointment with VA physician Gregory Elliot (Tr. 429-33). Plaintiff "walk[ed] with forearm crutches," but nonetheless had an "antalgic gait, limping, putting weight on the left side (Tr. 430). His right leg was discolored with some ulceration and showed trace swelling (*id.*). While Dr. Elliot examined his back, Plaintiff stood "with the support of the forearm crutches." (Tr. 431). Side-to-side flexion and rotation were limited and painful. Dr. Elliot diagnosed RSD and left hip pain secondary to favoring of the right leg (Tr. 433).

On May 17, 2006, a VA note described Plaintiff's appearance with a note that he "uses bilateral forearm crutches" (Tr. 424).

On December 7, 2006, VA notes indicate Plaintiff attended an appointment and "d[id] not have forearm crutches at th[at] time," but "walk[ed] with a limp." (Tr. 419).

### B.    Opinion Evidence

Shane Roberts, M.D., performed a consultative examination of Plaintiff on October 11, 2005 (Tr. 181-85). Plaintiff reported his problems had worsened since onset in 1999 (Tr. 181). Plaintiff was using "a wrist cane" (Tr. 183). Plaintiff was obese, walked with a slow, unsteady gait, and had difficulty moving from the chair to the exam table (Tr. 182-83). Plaintiff was taking Naprosyn and

Lopid (Tr. 182). Plaintiff was also reported as being cooperative and reliable (*id.*). Based upon his examination, Dr. Roberts opined that Plaintiff retained the RFC to (1) occasionally lift less than 10 pounds, (2) frequently lift less than 5 pounds, (3) stand and/or walk with normal breaks for less than two hours in an eight-hour workday, and (4) sit with normal breaks for less than six hours in an eight-hour workday (Tr. 184). Dr. Roberts also commented that Plaintiff's "wrist cane [and] immobile right ankle" were "significant to [his] physical limitations" (*id.*).[1]

C. Hancock, M.D., completed an assessment of Plaintiff's RFC on November 23, 2005 (Tr. 186-193). Dr. Hancock opined Plaintiff could occasionally lift 20 pounds; frequently lift ten pounds; stand and/or walk, with normal breaks, for at least two hours during an eight-hour workday; and sit, with normal breaks, for about six hours out of an eight-hour workday (Tr. 187). Dr. Hancock offered several postural limitations and stated Plaintiff should avoid concentrated exposure to extreme cold (Tr. 188, 190). Dr. Hancock indicated that his assessment was less restrictive than Dr. Roberts' because "[u]se is beneficial for RSD. [Plaintiff s]hould walk as much as tolerated." (Tr. 188, 192).

David Caye, M.S., conducted a mental evaluation of Plaintiff on May 4, 2006 (Tr. 221-27). Plaintiff told Mr. Caye he had been terminated from his job because of a pending workers' compensation claim (Tr. 222-23). Plaintiff also told Mr. Caye that he had been caring for his ill father, who had recently been moved into a nursing home (*id.*). Caring for his father occupied most of Plaintiff's energies: helping transfer his father from his wheelchair to the toilet, bathing, dressing, and feeding him, making sure he took his medications, and providing breathing treatments for him

---

[1] Dr. Roberts' assessment also states that Plaintiff cannot write legibly or complete a telephone call (Tr. 184). Plaintiff testified at the hearing, however, that he did not have any difficulty with either of these tasks (Tr. 284-85).

(Tr. 223).  After his father was placed in the nursing home, Plaintiff drove 70 miles each way to spend the days there (*id.*).  He stated he spent about 15 hours per day watching television (*id.*).  He also performed household chores: laundry every day, cooking two to three times per week, sweeping once weekly, dusting once or twice monthly, vacuuming monthly, and mopping every two months (*id.*).  He did the family shopping once monthly (*id.*).  Neither Mr. Caye nor George Livingston, Ph.D., who reviewed Plaintiff's file, opined Plaintiff had any greater than a moderate psychological limitation in any area (Tr. 228-242).

### C.     VA Determination

Also in May, 2006, the VA awarded Plaintiff disability benefits (Tr. 245).  The VA found Plaintiff suffered from chronic trochanteric bursitis of the left hip, degenerative disc disease of the lumbar spine, and RSD of the right lower extremity (Tr. 250).  The VA explained to Plaintiff,

> You did not meet the schedular requirements of a single disability rated at 60 percent or more, or two or more disabilities combining to 70 percent with a least one ratable at 40 percent.  However, as you have multiple disabilities from a single body system that combine to 60 percent, entitlement to pension benefits is granted."

### D.     Hearing Testimony

### 1.     Hearing of February 15, 2007

At the first hearing, much of Plaintiff's testimony recounted the events that caused him to stop working.  After developing RSD, Plaintiff's employer created a sedentary position for him to reduce its workers' compensation liability (Tr. 272).  Eventually, Plaintiff received a workers' compensation award of $15,000 for an 11 percent impairment to the lower right extremity (Tr. 274).  Plaintiff stated he filed a second workman's compensation claim based on the injury to his hip and back, and in December 2005, he was awarded $48,000 for a 35% impairment to the body as a whole

(*id.*).  Plaintiff's employer appealed the award and the matter had not been concluded at the time of the hearing before the ALJ (Tr. 274-75).  During this same time period, Plaintiff's father became ill and Plaintiff had to take intermittent leave to take him to doctor appointments (Tr. 278).  According to Plaintiff, when he filed his second workers' compensation claim, he was effectively terminated because his employer told him he could either put his father in a nursing home or leave (*id.*).  He stated his employer made his life miserable, even when he produced statements from his father's doctor explaining his absences, but he stuck it out until they terminated him (Tr. 279).

Plaintiff testified he attempted to work for about a month in September, 2005, delivering newspapers (Tr. 291, 293).  He was able to pull over and take breaks when necessary, but nonetheless had to quit because of hip pain (Tr. 292-93).  He also stated he lost money during that month (Tr. 294).

Describing his daily activities, Plaintiff stated he transported his father to and from his doctor's appointments and the hospital because he was the only family his father had in the area (*id.*).  Plaintiff stated if he did not care for his father, it would not get done absent placement in a nursing home (*id.*).  Plaintiff stated it hurt him to drive, but he had no other option (Tr. 280).  Plaintiff spends his day transporting his father to the doctors and also doing the grocery shopping, cleaning, washing and cooking (Tr. 281).  Plaintiff stated he performed the household chores by sitting for a period of time and taking aspirin to control the pain (*id.*).  Plaintiff stated he was taking regular aspirin and Naprosyn for pain (*id.*).

Plaintiff's attorney stated that Plaintiff did not use forearm crutches "all the time" but did need them "periodically" (Tr. 285).  The VE testified that the "occasional[]" use of wrist canes would have "some" impact on the unskilled work that person could perform, but other unskilled jobs

would be unaffected (Tr. 285).[2]  The VE also testified if Plaintiff could stand and/or walk with normal breaks for less than two hours per day and sit with normal breaks for less than six hours per day, as Dr. Roberts opined, he would be incapable of performing competitive work (Tr. 288).

### 2.    Hearing of August 12, 2008

During the hearing on remand, Dr. Arthur Lorber, an ME, testified by phone (Tr. 470-80). He testified he had reviewed Plaintiff's medical records, and he summarized his understanding of those records and offered his opinion (Tr. 472-73).  Dr. Lorber stated that Plaintiff "had an injury to his right foot [with] a resultant foot drop.  But he was able to continue working until apparently July of '05, when it appears that he stopped working, not because of a physical problem, but in order to care for his father who was seriously ill." (Tr. 473).  Dr. Lorber also mentioned Plaintiff's "severe medical impairments regarding his lumbar spine" and his diagnosis of greater trochanteric bursitis (*id.*).  Dr. Lorber opined that Plaintiff "quit work to take care of his father and . . . [he] can function on a full range of sedentary level of work." (*Id.*).  Dr. Lorber's summation did not specifically mention the diagnosis of RSD or the forearm crutches.  The ALJ asked Dr. Lorber about the "wrist canes," but Dr. Lorber stated he saw only one reference to Plaintiff's upper extremities in the record--a nurse's diagnosis of carpal tunnel syndrome (Tr. 474).  Dr. Lorber then stated, "is this man using a cane now?  There's no evidence in the past that he's been using a cane. . . .  One would not anticipate the diagnosis of greater trochanteric bursitis would be of such severity as to require that." (Tr. 475).

Plaintiff's attorney also asked Dr. Lorber about the crutches, at which time Dr. Lorber stated,

---

[2] Partly on the basis of this testimony, the Court previously found Plaintiff's ability to perform the full range of sedentary work had been eroded, and thus it was error for the ALJ to rely on the Grids at step five.

"[y]ou know, I recall that now." (Tr. 477). Dr. Lorber asked whether Plaintiff had been using the crutches every day since they were prescribed, and opined, "I believe the record will show that, although those crutches were prescribed, he's not used them on a consistent basis and *not ever since 2005*." (Tr. 477-78) (emphasis added).

The ALJ then asked Plaintiff about his use of the crutches, and Plaintiff testified he used them "about 80, 85 percent of the time" (Tr. 478). He continued, "I don't use them when I'm sitting down. I use them when I get up and move around. I use them when I go into town." (*Id.*). When asked whether he used the crutches around the house, Plaintiff replied, "[p]retty much. The only time I don't really use them is when I'm sitting down." (*Id.*). Plaintiff testified he had used the crutches since they were prescribed in 2005 (*id.*).

Following this exchange with Plaintiff, Dr. Lorber stated, "I've treated thousands and thousands of patients with trochanteric bursitis, greater trochanteric bursitis. Rarely do any of them need crutches to ambulate and that would be generally for a short period of time. The concept that this individual needs crutches for--because of greater trochanteric bursitis, I believe is bogus." (Tr. 480). He concluded by opining, "I do not believe they're required." (*Id.*).

Plaintiff's attorney asked the VE whether an individual with Plaintiff's age, education, and experience who was limited to sedentary work, and who was further limited in standing and walking by the use of bilateral forearm crutches, would be capable of performing work existing in significant numbers (Tr. 485). The VE replied that such an individual would be precluded from performing "industrial sedentary work," but there were a "very few residual jobs" such as "unskilled receptionist or office worker" that he might be able to perform (Tr. 486). Even those "residual" jobs, however, would require "some sort of modification . . . to allow for [the crutches]" because those jobs are not

completely inactive but require the employee to walk while carrying files (*id.*). The attorney also asked the VE what "level of usage" of forearm crutches would impact Plaintiff's ability to perform competitive work (Tr. 490). The VE replied that industrial sedentary work would be precluded whether the usage was as little as a third to half the time (Tr. 490). As for the residual, "office type" jobs, the VE stated that if the crutches were "required on a regular basis--meaning even half of the time--I'm sure that that would affect the ability to do those jobs." (Tr. 491).

###  E.  ALJ's Findings

Following the hearing, the ALJ issued an opinion that largely replicated his findings from the previous opinion (Tr. 307-19). At step one, the ALJ found that Plaintiff had not engaged in gainful activity since the date of his application (Tr. 309). At step two, the ALJ found that Plaintiff had several severe impairments, including a history of Achilles tendon injury with RSD, degenerative changes in the lumbar spine with spondylolisthesis, a history of trochanteric bursitis of the left hip, obesity, and depressive symptomatology (*id.*). The ALJ concluded at step three, however, that none of Plaintiff's impairments was severe enough to meet any listing (Tr. 310). The ALJ then evaluated Plaintiff's RFC and found he was able to perform the full range of sedentary work (*id.*). He specifically rejected the opinion of the consultative examiner, Dr. Roberts, that Plaintiff could not work for a full eight-hour day (Tr. 316).[3] At step four, the ALJ found that Plaintiff could not perform any of his past work (Tr. 318). Finally, at step five, the ALJ applied the Grids to find that Plaintiff could perform other work and was not disabled (*id.*).

---

[3] The ALJ found Dr. Roberts' opinion unconvincing because Dr. Roberts reported Plaintiff had trouble completing a questionnaire and could not use a telephone book, but Plaintiff testified he had no trouble with these tasks (Tr. 184, 284-85, 316). Plaintiff has not challenged the ALJ's rejection of Dr. Roberts' opinion.

## IV.    ANALYSIS

A claimant bears the burden of proof to show the extent of his limitations, but the Commissioner bears the burden to show that, given those limitations, there are other jobs the claimant can still perform.  *Walters*, 127 F.3d at 529.  If a claimant can perform the full range of any given exertional level of work (e.g., sedentary, light, or medium work), the Commissioner may meet this burden by relying on the Grids.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981) (to use the Grids, the claimant's abilities must "precisely coincide" with the categories used by the Grids).  But as this Court stated in Plaintiff's previous appeal, reliance on the Grids is improper when the claimant's ability to perform the full range of occupations at a particular exertional level is "significantly limit[ed]" by impairments not accounted for in the Grids.  *Cole v. Sec'y of Health & Human Servs.*, 820 F.2d 768, 771 (6th Cir. 1987).  If the claimant's occupational base is "eroded" in this manner, the Grids may be used only as a "framework" for decision, and the ALJ must find other evidence (for example, a VE's testimony) that a person with the claimant's limitations can perform other specific jobs existing in significant numbers.  Social Security Ruling ("SSR") 96-9p; *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 424 (6th Cir. 2008).  Thus, because the ALJ relied on the Grids to find Plaintiff was not disabled, the issue before the Court (for the second time) is whether the ALJ erred in finding that Plaintiff's use of crutches did not significantly erode his ability to perform the full range of sedentary work.

### A.    Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence.  42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528

(6th Cir. 1997)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted). The court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

**B.      Extent of Impairment Caused by Plaintiff's Use of the Crutches**

As noted above, the ALJ found that Plaintiff could perform the full range of unskilled sedentary work. If this finding was supported by substantial evidence, then the ALJ could properly rely on the Grids to find Plaintiff was not disabled. *See Kirk*, 667 F.2d at 535. While the use of "medically required hand-held assistive device[s]" like the forearm crutches prescribed to Plaintiff may erode the sedentary occupational base, SSR 96-9p. *See also* 20 C.F.R. § 404.1545(d), the ALJ found Plaintiff was "not 'medically required' to use crutches for ambulation . . . ." (Tr. 318). The Commissioner argues this finding was supported by substantial evidence.

15

### 1.      Were the Crutches Medically Required?

An assistive device is "medically required" when there is "medical documentation establishing the need for [the device] to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)."   SSR 96-9p.   A finding that crutches are "medically required" is a threshold requirement; if they are, the ALJ must still determine whether the medically required usage is so limiting that the sedentary occupational base is eroded.   *Id.*   To show that an assistive device is medically required, therefore, a claimant need only show that the device was medically indicated and under what circumstances it was indicated.   The claimant is not required to show that the use of the assistive device precludes any particular level of activity.   *See id.*

I **FIND** the record contains sufficient documentation of Plaintiff's medical need of the crutches to meet this threshold.   Dr. Huddleston prescribed the crutches in August, 2005, because of complications from Plaintiff's RSD--namely, ankle inversion, buckling of the knee, severe external rotation of the right leg, moderate to severe limp, atrophy of the right calf, and demineralization of the foot and ankle (Tr. 156-57).   Dr. Huddleston prescribed the crutches in order to "improve [Plaintiff's] gait mechanics and reduce the likelihood of falls," and Plaintiff was fitted with the crutches and trained in their usage per Dr. Huddleston's order (Tr. 155, 157).   Although Dr. Huddleston's prescription did not specify "whether [the crutches were needed] all the time, periodically, or only in certain situations" or the "distance and terrain" over which Plaintiff was to use them, SSR 96-9p, practicing physicians should not be faulted for failing to phrase their orders in the exact vocabulary used by the Commissioner.   I **FIND** Dr. Huddleston's prescription

adequately "describe[d] the circumstances for which [Plaintiff's crutches were] needed." *Id.* They were needed as often as Plaintiff, without them, would have been unable to walk with a proper gait and in any situation where he would have risked a fall, and they were indicated as long as the underlying symptoms were present. This assessment is supported by other evidence in the record: Dr. Hutcheson opined that Plaintiff's hip and back pain were caused by his abnormal gait, which was in turn caused by RSD (Tr. 257).

Dr. Lorber, as noted, opined that the crutches were not required (Tr. 480). The ALJ gave "considerable weight" to Dr. Lorber's opinion, which according to the ALJ was "consistent with the record as a whole." (Tr. 316, 318-19). Ordinarily, an ALJ is entitled to weigh conflicting medical evidence and draw his own conclusions. *Nejat v. Comm'r of Soc. Sec.*, No. 09-5193, 2009 WL 4981686, at *4 (6th Cir. 2009) (unpublished); *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009). But the ALJ's conclusion, as always, must be supported by "substantial evidence." 42 U.S.C. § 405(g). I **FIND** that Dr. Lorber's testimony does not support the ALJ's finding. First, Dr. Lorber testified that Plaintiff had used his crutches "not ever since 2005" (Tr. 478), an assertion that is plainly at odds with the record. Second, Dr. Lorber's testimony mistook the condition for which Plaintiff's crutches were prescribed. Only after prompting did Dr. Lorber "recall" that Plaintiff had been prescribed crutches (Tr. 472-77), and he continued to labor under the misapprehension that they were prescribed because of greater trochanteric bursitis, not RSD (Tr. 477-80). Dr. Lorber's opinion that the crutches were not medically necessary for trochanteric bursitis, consequently, could not undermine the evidence that Plaintiff needed the crutches because of complications from RSD.

I **CONCLUDE**, therefore, that Dr. Huddleston's prescription is uncontradicted by substantial

evidence, and Plaintiff's crutches were "medically required." This does not end the inquiry, however. It remains to be seen whether and to what extent this medically-required usage affected Plaintiff's ability to work.

### 2. Did Use of the Crutches Erode the Sedentary Occupational Base?

Although the ALJ improperly concluded the crutches were not medically required, he nonetheless properly considered the frequency with which and the circumstances under which Plaintiff used them. *See* SSR 96-9p ("An accurate accounting of an individual's abilities, limitations, and restrictions is necessary to determine the extent of erosion of the occupational base, the types of sedentary occupations an individual might still be able to do, and whether it will be necessary to make use of a vocational resource."). The ALJ assessed the record evidence and concluded Plaintiff did not need his crutches often enough to affect his ability to perform sedentary work (Tr. 316, 319).

Thus, if the ALJ's finding that Plaintiff did not need the crutches often enough to significantly erode the sedentary base was supported by substantial evidence, then the ALJ was entitled to rely on the Grids, *see Cole*, 820 F.2d at 771, and any error was harmless. *See Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) (error is harmless where remand would not change the result for the claimant). If, on the other hand, the ALJ's finding was not supported by substantial evidence, reliance on the Grids was improper, as noted above, and Plaintiff will have a remedy.

But what remedy? The VE testified that if Plaintiff needed to use his crutches even half the time, he would be precluded from performing competitive work (Tr. 485-86, 490-91). Plaintiff argues he has shown that he must use his crutches at least half of the time, and has therefore proven

both that the ALJ erred (in finding he could perform the full range of sedentary work) *and* that he is disabled.[4] If Plaintiff prevails on this argument, the ALJ's decision must be reversed and Plaintiff will be entitled to an award of benefits. *See Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994) (an award of benefits is appropriate where "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits."). But to prevail here, Plaintiff bears the burden of proof. *See Walters*, 127 F.3d at 529 (burden is on claimant to show severity of impairments).[5] Because Dr. Huddleston did not state how often Plaintiff was required to use crutches as a percentage of time, Plaintiff must therefore show other record evidence establishing the frequency with which he needed the crutches.

### a. Evidence supporting Plaintiff's position

### i. Plaintiff's testimony

Plaintiff testified that he used his crutches 80 to 85 percent of the time. The ALJ, however, found this testimony was not consistent with the record (Tr. 319). Credibility assessments are properly entrusted to the ALJ, not to the reviewing court, because the ALJ has the opportunity to observe the claimant's demeanor during the hearing. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234,

---

[4] If Plaintiff is required to use crutches at least half of the time and is therefore precluded from gainful employment, then, *a fortiori*, his use of the crutches significantly erodes his ability to perform sedentary work. A VE's testimony is substantial evidence of the jobs a claimant can perform so long as the VE's assumptions are accurate, *see Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), and an ALJ may not substitute his judgment for that of the VE on matters within the VE's expertise, *see Burkhart v. Bowen*, 856 F.2d 1335, 1341 (9th Cir. 1988). Since the VE's testimony was uncontradicted, only one issue of fact remains with respect to whether Plaintiff is disabled--the percentage of time he is required to use crutches.

[5] Contrast this burden with the Commissioner's: Plaintiff must show the extent of his impairments, but the Commissioner must show that a person with those impairments is nonetheless able to perform work existing in significant numbers. *Id.*

247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Indeed, the ALJ had an opportunity to observe Plaintiff's demeanor on two occasions. The ALJ is not free, however, to make a credibility judgment based solely on intuition, but must find support for that judgment in the record, and must explain the determination sufficiently to make clear to subsequent reviewers the weight given to the testimony and the reasons for that weight. SSR 96-7p; *Rogers*, 486 F.3d at 247-48. Thus, in order to reject a claimant's testimony, the ALJ must point to inconsistencies between the testimony and other record evidence.

Here, the ALJ found Plaintiff's allegations of difficulty with walking and prolonged standing were "generally credible," (Tr. 315), but rejected Plaintiff's testimony about his use of the crutches for two specific reasons: first, that Dr. Lorber testified Plaintiff did not need them (Tr. 318-19), and second, that Plaintiff's testimony was inconsistent because he testified at the first hearing that he used the crutches "occasionally" but testified at the second hearing that he used them 80 to 85 percent of the time (Tr. 319). As explained above, Dr. Lorber's testimony was based on an incomplete recollection and it does not support the ALJ's finding. As for the latter reason, the ALJ was incorrect to quote Plaintiff as testifying that he used crutches "occasionally." The ALJ is apparently referring to a question Plaintiff's attorney posed to the VE regarding the impact on unskilled work for "an individual who'd occasionally need to use wrist canes" (Tr. 285). Plaintiff did not state how often he used the crutches at the first hearing, although his attorney did state that he used them "periodically" (Tr. 285). Moreover, Plaintiff stated early in the process of applying for benefits that he "pretty much commonly use[d]" the crutches (Tr. 63). I **FIND** neither of the ALJ's stated reasons supports his adverse credibility finding. The ALJ also found, however, that Plaintiff's testimony was inconsistent with the record as a whole (Tr. 316, 319). I therefore consider

20

the other evidence relied on by the ALJ.

### b. Evidence relied on by the ALJ

In discussing the record evidence, the ALJ cited four reasons for his finding that Plaintiff was able to perform the full range of sedentary work: first, that Dr. Lorber testified the crutches were not medically necessary (318-19); second, that Plaintiff stopped work to take care of his father rather than because of his medical impairments and there was no evidence his condition deteriorated after that time (Tr. 313, 319); third, that Plaintiff's "primary treatment" for RSD was a supportive brace (Tr. 314); and fourth, that notations in the medical records suggest Plaintiff did not always use his crutches and Plaintiff "admitted that he is able to ambulate without [the crutches]" (Tr. 314 n.1, 318). As explained above, the first reason, that Dr. Lorber testified that Plaintiff did not need crutches for trochanteric bursitis, is not inconsistent with Plaintiff's use of crutches for RSD, and Dr. Lorber's testimony therefore does not support the ALJ's finding. The remaining three reasons will be considered in turn.

### i. Plaintiff's termination of work

As Plaintiff admitted, he stopped work when he was terminated by his employer, at a time when he was missing work in order to take care of his ill father (Tr. 277-79). The ALJ relied on this admission to find that Plaintiff "stopped working for reasons other than his medical impairments." (Tr. 313). The ALJ observed that Plaintiff stopped working for non-medical reasons the month before he was prescribed forearm crutches, and therefore found the crutches were not necessary to the extent alleged (Tr. 313). Similarly, the ALJ relied on Dr. Lorber's testimony that if Plaintiff was able to work until he stopped to take care of his father, there was no medical reason he could not work after that time (Tr. 314). Neither the ALJ nor Dr. Lorber, however, accounted for Plaintiff's

uncontradicted testimony that, at the time he was terminated, he was working in a position with minimal job duties created by his employer in order to reduce its workers' compensation liability (Tr. 272).  It is mere conjecture to assume that Plaintiff's continued employment in such a position showed he was capable of performing competitive work.

### ii.  Plaintiff's use of a supportive brace

The ALJ found it significant that Plaintiff's "primary treatment" for RSD was a supportive ankle brace (Tr. 314).  To be sure, the ankle brace was Plaintiff's "primary" treatment in the sense that it was prescribed *prior to* the crutches, but no medical opinion indicates that Plaintiff's RSD should have been treated with the ankle brace *instead of* the crutches.  To the contrary, the record shows that the treatments were intended to be complementary.  When Dr. Huddleston prescribed the crutches, he also ordered a new ankle brace for Plaintiff (Tr. 157).  Similarly, when Plaintiff was trained to use his crutches, the notes show that he was using the brace at that time (Tr. 155).  Again, when Plaintiff was examined in October, 2005, the notes show he was using both the crutches and the ankle brace (Tr. 439).  That Plaintiff also used an ankle brace can hardly support a finding that he did not need crutches.

### iii.  The notations regarding use of the crutches

The ALJ pointed to several notations in the record after Plaintiff was prescribed the crutches, some indicating he did not always use them (Tr. 314 n.1).  The ALJ cited a "stress test" in January, 2008, during which Plaintiff did not use his crutches, but, as Plaintiff points out, this was an adenosine stress test (Tr. 383), which is used for patients unable to exercise on a treadmill [Doc. 16 at 3].  This notation does not support the ALJ's finding.

In December, 2005, Plaintiff was observed to ambulate "independently," but the note also

indicates he walked with a significant limp (Tr. 436). Furthermore, even a person who is using crutches to walk may be said to ambulate "independently." *See Key v. Astrue*, 2009 WL 3028978, at *6 (M.D. Fla. 2009). This notation is too equivocal to provide substantial support for the ALJ's finding.

Next, in December, 2006, Plaintiff attended an appointment but did not have his crutches "at this time." Plaintiff was also walking with a limp, however, and rated his pain at 8/10 (Tr. 419-22). Furthermore, as Plaintiff suggests, this notation may be the exception that proves the rule: it is difficult to see why the note would have been phrased as it was unless Plaintiff ordinarily used his crutches.

On the other hand, at least four other notations in the record show unequivocally that Plaintiff did use his crutches after they were prescribed: on October 11, 2005 (Tr. 183); October 18, 2005 (Tr. 439); April 10, 2006 (Tr. 430); and May 17, 2006 (Tr. 424). The April, 2006, notation states that even with forearm crutches, Plaintiff walked with an "antalgic gait, limping, putting weight on the left side," and indicates that he needed the crutches to stand while his back was examined (Tr. 430-31).

Taken all together, these notations show that Plaintiff's need for the crutches was sometimes more acute than at others. Plaintiff's ability to manage without the crutches on occasion, however, in no way shows that, in doing so, he was not risking a fall or worsening the mechanics of his gait and thereby aggravating his underlying problems. Nor is Plaintiff's "admission" that he is able to ambulate without the crutches inconsistent with his position that he needs them at least half of the time. I **FIND** the notations regarding Plaintiff's use of crutches do not undermine his testimony or his position that he needs them at least half the time.

I further **FIND**, in light of the entire record, that substantial evidence does not support the finding that Plaintiff's use of bilateral forearm crutches did not significantly limit his ability to perform the full range of sedentary work. The evidence cited by the ALJ shows that Plaintiff ambulated with pain and difficulty even when he was using his crutches, and it is not realistic to expect Plaintiff to forego these assistive devices, aggravating his symptoms and risking a fall, so that he can carry "articles like docket files, ledgers, and small tools" while "walking or standing." 20 C.F.R. § 404.1567(a) (defining sedentary work). Accordingly, as in Plaintiff's prior appeal, I **CONCLUDE** the ALJ's reliance on the Grids at step five cannot support the Commissioner's determination that Plaintiff is not disabled.

### C.    Remedy

Ordinarily, when an ALJ improperly relies on the Grids, a remand is necessary so that the ALJ may take other evidence (such as a VE's testimony) to determine whether the claimant's occupational base, although diminished, can still support a transition to other work. *See* SSR 96-9p; *Jordan*, 548 F.3d at 424-25. In this case, however, that question has already been answered by the VE in categorical terms: if Plaintiff needed to use his crutches even half the time, he would be precluded from performing competitive work (Tr. 485-86, 490-91). Therefore, because the VE's testimony is uncontradicted in the record, whether Plaintiff is entitled to an award of benefits turns on whether the record adequately establishes that he needed to use his crutches at least half the time. *See Faucher*, 17 F.3d at 176. I **FIND** that it does not.

As noted above, Plaintiff bears the burden of proof to show the severity of his impairments. *See Walters*, 127 F.3d at 529. Here, to establish the frequency with which his crutches are required, Plaintiff has offered only his own testimony. While that testimony, which is corroborated by the

other record evidence, does tend to show how often Plaintiff actually used the crutches, it does not show how often he was *required* to use them in order to achieve the medical purposes for which they were prescribed.[6]

Neither the Commissioner nor Plaintiff has met his burden of proof in this matter. Because the ALJ's finding that Plaintiff could perform the full range of sedentary work was not supported by substantial evidence, the ALJ improperly relied on the Grids and failed to show other evidence that Plaintiff could perform jobs existing in significant numbers. Plaintiff thus prevails on this point. But Plaintiff, for his part, has failed to show that he must use the crutches frequently enough to bring him within the VE's categorical testimony.

I **RECOMMEND**, therefore, that this matter again be **REMANDED** under sentence four of 42 U.S.C. § 405(g). Twice the ALJ has improperly relied on the Grids to find Plaintiff not disabled. Plaintiff has awaited a properly supported decision since he applied for benefits in August, 2005. For a second time, this matter should be remanded with instructions that the ALJ assess the extent to which Plaintiff's use of crutches affects his ability to perform sedentary work. On remand, the ALJ should promptly determine how often Plaintiff is required to use bilateral forearm crutches. If that evidence establishes that Plaintiff must use his crutches at least half the time, Plaintiff should be found disabled on the current record. If not half the time, the ALJ should determine whether, given the erosion of Plaintiff's occupational base, there are specific jobs existing in significant numbers that he can still perform.

---

[6] An opinion from a consultative examiner, as suggested by Plaintiff's attorney, could have been helpful in this regard (Tr. 487).

## V.    CONCLUSION

Having carefully reviewed the administrative record and the parties' pleadings, I

**RECOMMEND:**[7]

(1)    Plaintiff's motion for summary judgment [Doc. 15] be **GRANTED** to the extent it seeks a remand to the Commissioner.

(2)    Defendant's motion for summary judgment [Doc. 21] be **DENIED**.

(3)    The Commissioner's decision denying benefits be **REVERSED** and this action be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g).


s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[7] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).